IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

Q PUBLISHING GROUP, LTD.,
a Colorado limited liability company,

      Plaintiff,

v.

OUTFRONT MEDIA INC.,
a Maryland corporation and real estate investment trust,

      Defendant.

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff Q Publishing Group, Ltd. ("Q Publishing"), for its Complaint against Defendant Outfront Media Inc. ("OMI"), alleges as follows:

### PARTIES

1.      Q Publishing is a Colorado limited liability company having its principal place of business 3535 Walnut Street, Denver, Colorado 80205.

2.      Upon information and belief, OMI is a Maryland corporation having an address at 405 Lexington Avenue, 17th Floor, New York, New York 10174, and operates as a real estate investment trust ("REIT").  OMI shares are publicly traded on the New York Stock Exchange under the symbol "OUT."

### JURISDICTION AND VENUE

3.      Q Publishing owns and operates OUT FRONT, a news publication reporting on issues relevant to the gay and lesbian community, which has been continuously operating under

1

the OUTFRONT name since 1976.  Q Publishing generate revenues, which allows it to distribute the paper for free, by selling advertising space in the paper.  OMI recently adopted and began using, without authorization from Q Publishing, OUTFRONT on and in connection with its sale of advertising space on billboards and transit sites.  Indeed, OMI's prolific unauthorized use of OUTFRONT has now generated significant and ongoing actual consumer confusion which severely damages Q Publishing's common law trade and service mark rights in and to OUTFRONT.  Q Publishing thus makes this Complaint for unfair competition arising under § 43 of the Lanham Act, 15 U.S.C. § 1125(a), deceptive trade practices under COLO. REV. STAT. §§ 6-1-101 *et seq.*, and unfair competition and misappropriation under Colorado common law.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000.  This Court also has original subject matter jurisdiction over Q Publishing's claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 15 U.S.C. § 1121.

5.     The Court has personal jurisdiction over OMI as the claims arise from OMI's transactions of business in this judicial district, as Q Publishing's claims arise from OMI's commission of tortious acts in this judicial district, and as Q Publishing is being damaged in this judicial district by OMI's tortious conduct.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**A.**      **Q Publishing, Its Use of OUT FRONT and Its Rights in the Name**

7.      The OUT FRONT paper was first published in 1976 by Philip Price.  At that time, Mr. Price decided the gay and lesbian community needed an advocate and a presence in the media, hoping the paper could effect positive social change on national, state and local government issues.  Mr. Price's hope has now come true.

8.      Below is a copy of the front page of the first OUT FRONT paper, published April 2, 1976.



The paper has been since 1976 published continuously and always under the name OUT FRONT. (*See* Exhibit 1, which shows copies of first pages of various papers published over the years, with all of those covers being incorporated herein by this reference.)

9.     Mr. Price grew OUTFRONT from a simple newsletter to a bustling, multi-city paper with a growing popularity and expanding reach.  Importantly, Mr. Price and his successors did so expressly with the help of local, regional and later national advertisers who, without their financial support, OUTFRONT would not have been possible.

10.    Not surprisingly, the number of entities and individuals who advertise in OUTFRONT have grown over time, all seeming to recognize the strength behind the OUTFRONT brand.  Indeed, OUTFRONT's readers are important to its advertisers, as they remain an engaged and engaging force, helping spread awareness of issues that concern the lesbian, gay, bisexual and transgender ("LGBT") community.

11.    Today, the OUTFRONT printed paper boasts more than 200 drop off points that reach upwards of 76,000 unique readers each and every month.  Moreover, the paper is provided to readers not only in Colorado, but also in Pennsylvania, Utah, Washington, D.C., New York, New Jersey, Wyoming and California.

12.    Also, Q Publishing began a web page for the OUTFRONT paper in approximately 2001.  That web page could be found at www.outfrontcolorado.com, and included content from the OUTFRONT paper starting by at least 2006.  The web page was branded with OUTFRONT and included front covers of issued papers, all of which also included OUTFRONT prominently.

13.    When Q Publishing was acquired by the current ownership group, use of the www.outfrontcolorado.com website was discontinued and use of www.outfrontonline.com was commenced as the domain name for the electronic version of OUTFRONT.  Indeed, since at least June 6, 2012, Q Publishing has published a digital edition of its paper, bannered with the

4

name OUT FRONT and which may be accessed through its new website, which is also bannered

with the name OUT FRONT.  Currently, Q Publishing's website receives approximately 41,000

unique visitors per month.   A screen capture of content shown recently on the

www.outfrontonline.com website can be seen below:



14.     In addition to publishing print and electronic media content and selling

advertising space therein, Q Publishing offers numerous additional products and services to its

customers and potential customers, all under the brand OUT FRONT.  These include:

- Advertising agency services in the nature of planning, designing and supervising the development of multimedia advertisements and the design and implementation of overall media and public relations campaigns, including buying media space in newspapers and on websites, radio, television, etc. for its customers.

- Developing and deploying wild postings, billboard postings and gorilla marketing materials (i.e., outdoor marketing activity) for its customers.

- Providing archival services for others related to securely storing cultural, governmental, business, news and historical event information, among other types of information. These archives are generally kept at the Denver Public Library, Denver Museum of Nature and Science, and soon at the American Heritage Center in Wyoming.

- Providing consulting services to others which are designed to help the customer effectively design and implement their own media and publicity campaigns.

- Providing strategic market planning, direct market promotion program development, interactive marketing program development, and implementation, website design and development of social media initiatives for others.

- Designing and implementing interactive advertising campaigns for its clients and utilizing various electronic medium, including mobile phones, computers, tablets and websites.

- Designing and implementing branded promotional product campaigns for itself and for its clients.

- Designing and implementing direct mail, radio and television advertising campaigns for customers and for itself.

- Organizing and advertising various fairs, festivals and other similar events, with much of the advertising for these events being of an outdoor variety, i.e., banners, signs, handbills, etc.

15. Q Publishing's OUT FRONT publications are also advertised via Twitter, where it has 3,359 followers, and Facebook, where it has 7,903 followers.

16. The lifeblood of Q Publishing's media business, as it is for all media businesses, is advertising, and thus advertisers. These advertisers include numerous individuals and entities that operate business which are both regional and national in scope. Some of these include Western Stone and Material Corporation (which operates Shane Co. Jewelry Stores) ("Shane Co.") and Grossman Plastic Surgery. A list of advertisers who placed advertisements in OUT FRONT in the last three years is attached as Exhibit 2, and that list is incorporated herein by this reference.

6

17.     The continuous use of OUT FRONT in connection with an advertising business and paper publications since 1976, electronic publications since 2001 and related services since at least 2010 has resulted in the development of strong common law rights in and to the name when used in connection with such services and products.  Indeed, OUT FRONT, when used in connection with advertising services and related branded products, now generates significant, substantial and commercially important goodwill from advertisers and readers of the OUT FRONT products, with all of that goodwill inuring exclusively to the reputational and pecuniary benefit of Q Publishing.  Accordingly, strong common law rights have now been acquired in OUT FRONT by Q Publishing ("OUT FRONT Mark").

18.     Recently, Q Publishing filed an application with the United States Patent and Trademark Office ("USPTO") to seek registration of the OUT FRONT Mark on the Principal Trademark Register of the United States.  The application is assigned Serial Number 86/487,892 and seeks registration of the OUT FRONT Mark in International Classes 16, 35 and 41, generally for provision of advertising services through the use of branded physical and electronic newspapers and magazines.  Q Publishing expects the application will mature into a registration in due course.

**B.     OMI's Business**

19.     OMI is one of the largest providers of advertising space on out-of-home advertising structures (primarily billboards and transit spaces) across the United States, Canada and Latin America.  The majority of OMI's advertising structures are located on the most heavily traveled highways and roadways in the top Nielsen-Designated Marketing Areas.  OMI suggests that the breadth and depth of its advertising options provides its customers with a multitude of

options to address a wide range of marketing objectives, from national, brand-building campaigns to hyper-local businesses that want to drive customers to their retail locations "one mile down the road." (*See* Exhibit 3, p. 1 and select pages, Form 424B3 Prospectus filed with the Securities and Exchange Commission by OMI on January 2, 2015 ("Prospectus"), which is incorporated herein by this reference.)

      20.    OMI explains its general business history by stating in the Prospectus:

      Our corporate history can be traced back to companies that helped to pioneer the growth of out-of-home advertising in the United States, such as Outdoor Systems, Inc., 3M National, Gannett Outdoor and TDI Worldwide Inc. In 1996, a predecessor of CBS acquired TDI Worldwide Inc., which specialized in transit advertising. Three years later, a predecessor of CBS acquired Outdoor Systems, Inc., which represented the consolidation of the outdoor advertising assets of large national operators such as 3M National, Gannett Outdoor (and its Canadian assets held in the name Mediacom) and Vendor (a Mexican outdoor advertising company) and many local operators in the United States, Canada and Mexico. In 2008, a subsidiary of CBS expanded our business into South America through the acquisition of International Outdoor Advertising Holdings Co., which operated in Argentina, Brazil, Chile and Uruguay. The company that we are today represents the hard-to-replicate combination of the assets of all of these businesses, as well as other acquisitions and internally developed assets.  [This business operated under the name "CBS Outdoor."]

      On April 2, 2014, [CBS Outdoor] completed an initial public offering (the "IPO") of [its] common stock. On April 16, 2014, CBS received a private letter ruling from the Internal Revenue Service (the "IRS") with respect to certain issues relevant to [its] ability to qualify as a REIT. On July 16, 2014, CBS completed [a] CBS Exchange Offer, and in connection with the CBS Exchange Offer, CBS disposed of all of its shares of [CBS Outdoor's] common stock. On July 16, 2014, in connection with [a] Separation[ Agreement, CBS Outdoor] ceased to be a member of the CBS consolidated tax group, and on July 17, 2014, [CBS Outdoor] began operating in a manner that will allow [it] to qualify as a REIT for U.S. federal income tax purposes for [its] tax year commencing July 17, 2014 and ending December 31, 2014.

21.     As may be most relevant here, until very recently, OMI branded its advertising

services and related products with the "CBS" mark and logo.  However, on November 20, 2014,

the Company rebranded to OUTFRONT, explaining:

> In connection with the IPO, we entered into a license agreement with a
> wholly owned subsidiary of CBS, pursuant to which we had the right to use
> "CBS" in the corporate names of the Company and the right to use the "CBS"
> mark and the "CBS" logo on our advertising billboards for a limited period of
> time following the Separation. On November 20, 2014, we rebranded, and the
> Company changed its legal name to "OUTFRONT Media Inc." and changed the
> logo on its advertising billboards to "OUTFRONT".

Pursuant to the active license with CBS, OMI has the right to use the "CBS" mark and logo on

advertising displays until March 31, 2016.

22.     OMI also relevantly prophesized:

> We may not be able to maintain or enjoy comparable name recognition or
> status under our new brand as we did using the "CBS Outdoor" brand name. **In
> addition, we may face the risk of claims that we have infringed third parties'
> intellectual property rights with respect to our trademarks, which could be
> expensive and time consuming to defend, could require us to alter our
> trademarks, and/or could require us to pay license, royalty or other fees to
> third parties in order to continue using our trademarks. If we are unable to
> successfully manage the transition of our business to our new brand, our
> revenue and profitability could decline, which could adversely affect our
> business.**  (Emphasis added.)

23.     OMI then explains in the Prospectus that it operates in a highly competitive

industry and admits that it competes with print and Internet-based media, relevantly stating:

> We also compete with other media, including broadcast and cable
> television, radio, print media, the Internet and direct mail marketers, within their
> respective markets.

However, despite this significant competition, OMI reports in the Prospectus that it is very

profitable:

*Strong Profitability and Significant Cash Flow Generation.* Our business has been highly profitable and has generated significant cash flows. In the nine months ended September 30, 2014, our U.S. Adjusted OIBDA margin was 35%. In 2013, our U.S. Adjusted OIBDA margin was 36%. We also benefit from significant operating leverage due to our high proportion of fixed costs, which allows us to generate significant OIBDA and cash flows from incremental revenues. In the nine months ended September 30, 2014, we generated cash flows from operating activities of $184.5 million. In 2013, we generated cash flows from operating activities of $278.4 million. In addition, most of our capital expenditures are directed towards new revenue-generating projects, such as the conversion of traditional static billboard displays to digital billboard displays.

24.     OMI has started to rebrand its advertising structures with the name OUTFRONT and thus started to actively compete with Q Publishing and its OUTFRONT print and electronic media.  For instance, just in the metro Denver market, the following billboards show how OMI is rebranding its advertising structure from CBS to OUTFRONT:




 

 

25.     OMI also is seeking to register at the USPTO the following OUTFRONT marks:

| Citation | USPTO Status and Date | Goods and Services | Owner |
|---|---|---|---|
| OUTFRONT MEDIA<br><br>OUTFRONT media<br><br>App 86-406,041 | **USPTO Status:** Non-final action - mailed<br>**USPTO Status Date:** 16-JAN-2015<br>**App** 25-SEP-2014 | **35:** Advertising agencies; advertising; commercial information agencies; publicity consultation; publicity agencies; bill-posting; publicity material rental, updating of advertising | OUTFRONT MEDIA LLC DELAWARE LIMITED LIABILITY COMPANY 405 LEXINGTON AVENUE NEW YORK, NEW YORK, |

| | | material; rental of advertising space; providing and rental of advertising space; rental of advertising time on communication media; publication of publicity texts; advertising by mail order; direct mail advertising; dissemination of advertising matter; outdoor advertising; sales promotion for others; online advertising on a computer network; advertising of audio and visual content via television, cable and satellite, radio, internet, mobile and wireless communication devices; organization of exhibitions for commercial or advertising purposes; marketing research, marketing studies; public relations; compilation and systemization of information into computer databases; interactive advertising for others via mobile phones and other personal digital equipment | 10174 |
|---|---|---|---|
| OUTFRONT MEDIA ALWAYS<br><br>OUTFRONT MEDIA ALWAYS<br><br>**App** 86-468,847 | **USPTO Status:** Non-final action - mailed<br>**USPTO Status Date:** 16-JAN-2015<br>**App** 02-DEC-2014 | **35:** Advertising agencies; advertising; commercial information agencies; publicity consultation; publicity agencies; bill-posting; publicity material rental, updating of advertising material; rental of advertising space; providing and rental of advertising space; rental and sale services of adverting space; rental of advertising time on communication media; publication of publicity texts; advertising by mail order; direct mail advertising; dissemination of advertising matter; outdoor advertising; sales promotion for others; online advertising on a computer network; advertising of audio and visual content via television, cable and satellite, radio, internet, mobile and wireless communication devices; organization of exhibitions for commercial or advertising purposes; marketing research, marketing studies; public relations; compilation and systemization of information into | OUTFRONT MEDIA LLC DELAWARE LIMITED LIABILITY CO.<br>405 LEXINGTON AVENUE NEW YORK, NEW YORK, 10174 |

| | | | |
|---|---|---|---|
| | | computer databases; interactive advertising for others via mobile phones and other personal digital equipment | |
| OUTFRONT MEDIA<br><br>OUTFRONT MEDIA<br><br>**App** 86-300,300 | **USPTO Status:** Opposition papers filed<br>**USPTO Status Date:** 24-DEC-2014<br>**App** 04-JUN-2014 | **35:** Advertising agencies; advertising; commercial information agencies; publicity consultation; publicity agencies; bill-posting; publicity material rental, updating of advertising material; rental of advertising space; providing and rental of advertising space; rental of advertising time on communication media; publication of publicity texts; advertising by mail order; direct mail advertising; dissemination of advertising matter; outdoor advertising; sales promotion for others; online advertising on a computer network; advertising of audio and visual content via television, cable and satellite, radio, internet, mobile and wireless communication devices; organization of exhibitions for commercial or advertising purposes; marketing research, marketing studies; public relations; compilation and systemization of information into computer databases; interactive advertising for others via mobile phones and other personal digital equipment | CBS OUTDOOR LLC DELAWARE LIMITED LIABILITY CO. 405 LEXINGTON AVENUE NEW YORK, NEW YORK, 10019 |

26.    Q Publishing's and OMI's advertisers and content readers are now becoming confused by the common use of OUTFRONT by both entities.   As the junior adopter of the name, OMI's use of OUTFRONT constitutes actionable infringement of Q Publishing's predominant legal rights, and that unauthorized use should now be immediately enjoined.

### C.    Facts Evidencing Infringement and Misappropriation

27.    Trademark protection is a valuable right gained through use of a mark in commerce and those rights can last indefinitely.   A trademark registration will give the user

stronger rights nationally, but an unregistered mark can be just as strong as one registered with the USPTO, especially where it is supported by customer recognition, advertising and national use.  Also, infringement of either registered or unregistered marks are based upon nearly identical factual determinations.

28.     Infringement of a trademark can occur when a junior user adopts a mark and the relevant public believes that junior user and the senior user are somehow connected or affiliated, when in fact they are not connected or affiliated.  There are generally two types of confusion which can be addressed through trademark law -- forward and reverse confusion.  When a junior user adopts a mark and the relevant public believes that junior user is connected/associated with a senior and larger user of a similar mark, forward confusion occurs.  Reverse confusion involves the use typically by a large company of a trademark which is confusingly similar to a small company's previously adopted trademark.

29.     In the Internet age, reverse confusion becomes more prevalent because marks that could not have been used in the same context (or even the same state) can be seen within seconds of each other. As the Ninth Circuit has stated: "[w]hereas in the world of bricks and mortar, one may be able to distinguish easily between an expensive restaurant in New York and a mediocre one in Los Angeles, see, e.g., *Sardi's Restaurant*, 755 F.2d at 723-24, the Web is a very different world."  *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1206-07 (9th Cir. 2000) (finding that parties' services were similar, for purposes of establishing likelihood of confusion of Web site "GoTo" and "Go Network" logos in trademark infringement suit, where both entities operated Web search engines and were, therefore, direct competitors, even if one were to concentrate on the areas of entertainment and leisure).  More particularly, the essence of reverse

confusion is that, even though there may be little chance that the junior user is trying to capitalize on the smaller senior user's market share or goodwill, the small company will have its horizons for growth and uniqueness cut short and its identity blurred by the large company.

30.     For instance, in *Dreamwerks v. Dreamworks*, the Ninth Circuit found that the senior user was a small company that put on science fiction conventions, and the junior user was the well-known Dreamworks film studio. The court stated that, if the roles were reversed, there would be no doubt that the larger Dreamworks would have stated a claim for trademark infringement. As the court explained, "The reason for this, of course, is that a famous mark like DreamWorks SKG casts a long shadow. Does the result change in a reverse infringement case because the long shadow is cast by the junior mark? We think not." *Dreamwerks Production Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1130 (9th Cir. 1998).  In *Big O Tire Dealers, Inc. ("Dealers") v. The Goodyear Tire & Rubber Co. ("Goodyear"),* 561 F.2d 1365 (10th Cir. 1977), another example of reverse trademark confusion is discusses.  In this case, the Tenth Circuit found that Goodyear's use of BIG FOOT as part of a multi-million dollar, national advertising campaign infringed upon the Dealers' prior trademark rights in and to "BIG FOOT" for use in connection with tires.  Dealers were ultimately awarded a permanent injunction and more than $5 million in actual and punitive damages on their reverse confusion claim.

31.     In this case, Q Publishing is experiencing both forward and reverse confusion. Both of those confusions occur when either its or OMI's advertisers and/or content readers believe, wrongly, that the two companies are associated or somehow connected.  This confusion creates not only severe reputational, but also pecuniary, harm to Q Publishing, the owner of the senior trademark rights.

32.     Trademark or service mark infringement is determined by looking at a number of factors, none of which is dispositive, but all of which reviewed together will leave a fact finder with an understanding of whether relevant consumers will likely be confused by the junior users use of the challenged mark.  All of these factors here, discussed below, tip in favor of finding confusion and thus infringement by OMI.

### A.     Strength of the senior users mark

33.     A strong trademark or service mark is entitled to broader protection than a weak trademark or service mark.  Trademark strength is typically considered in the context of both conceptual strength and commercial strength.  Conceptually, a strong mark is one that is "arbitrary" (i.e., it does not describe the goods or services, such as how "Greyhound" does not describe a bus service), but is used in connection with a good or service in such a way that it identifies the source of the good or service.  The OUT FRONT Mark is conceptually strong because it does not describe advertising services or printed/electronic publications, but is used extensively with those services and goods to identify Q Publishing.

34.     Commercial strength is determined by reviewing any unpoliced third party use of identical or similar marks on identical or similar goods or services, in overlapping geographic areas.  Here, Q Publishing has conducted a search and found the following third parties may use OUT and FRONT in combination and as a name for goods or services related to advertising or print/electronic publication:

| Citation | Status | Goods and Services | Owner |
|---|---|---|---|
| OUT FRONT **Reg** 930630 | WI | Radio programs pertaining to the gay, lesbian & bisexual communities in Madison, WI | **Registrant** DAVID WALTER MACHEN 1505 WILLIAMSON STREET #3 MADISON, WISCONSIN 53703 |

| | | | |
|---|---|---|---|
| http://outfront.com/why-outfront/ | why outfront? - Out Front Marketing - Retailtainment ... <br><br> outfront .com/why- outfront Cachedwhy outfront ? We are a leader in innovative retailtainment solutions that transform Walmart parking lots into brand destinations, including: Brand engagement events ... | why outfront? - Out Front Marketing - Retailtainment ... | |
| http://www.kw.com/kw/outfront.html | OutFront Magazine by Keller Williams RealtyCached www.kw.com/kw/ outfront .html-Cached-Similar OutFront is Keller Williams Realty's semi-monthly publication, focused on the Keller Williams advantage, success strategies among our associates throughout ... | OutFront Magazine by Keller Williams Realty | |
| http://www.outfront.org/programs | Programs | OutFront Minnesota THIS REFERENCE WAS RETRIEVED THROUGH ADDITIONAL RESEARCH | Programs | OutFront Minnesota | |
| http://www.outfrontcreative.com/ | Outfront CreativeCached www. outfront creative.com/-Cached-Similar OutFront Creative offers a full line of Promotional Products. Great selection of business promotional items and branded products. Fast service and low prices on ... | Outfront Creative | |
| OUTFRONTMAG.COM | out-front-magazine-3 | NETWORK SOLUTIONS, LLC. Tracey LeRoy 801 Violet Ave. Pensacola FL 32505 US Phone: +1.8505542811 Ext.: Fax Ext: Email: outfrontmagazine.contact@gmail.com Registry Admin ID: | **Status:** Accessible |

35.     Upon information and belief, Mr. Machen no longer performs his radio program and has not done so for some period of time.  Also on information and belief, outfrom.com offers only personal, consumer-direct marketing services and then only exclusively in Wal-Mart parking lots -- it does not sell print or electronic publication advertising space.  The Keller Williams magazine, upon information and belief, is an internal informational publication exclusively distributed to Keller William employees and no advertising space within that publication is sold to any third party.  Outfront.org promotes LGBT issues in Minnesota, but does not sell advertising space on its website, nor does it seem to offer any type of advertising services at all -- rather, its services appear to be exclusively educational and lobbying in nature. Outfront Creative is in the business of, upon information and belief, designing products and content which could be used for advertising purposes by others, but does not sell advertising space and importantly uses "creative" as a significant element of its overall business name. Finally, Outfront Magazine primarily designates itself with the brand "OF" and always seems to utilize "magazine" when displaying Out Front and is, upon information and belief, a bi-monthly publication that primarily serves the African-American community in Florida, Arkansas, Louisiana, Alabama, Mississippi, Tennessee, Georgia, North Carolina and South Carolina.  All of these third parties are, if in business at all, easily distinguishable from Q Publishing and its OUT FRONT Mark.

36.     Even if these third parties have used OUTFRONT or OUT FRONT in relevant marketplaces, which may not actually be the case, none have ever created any confusion in any marketplaces in which Q Publishing offers services and no actual confusion by any of these possible third party users has ever occurred to Q Publishing's knowledge.  Also, none seem to be

providing services of products in areas which are geographically overlapping with the primary markets of Q Publishing.  Accordingly, while Q Publishing recognizes that if the above-referenced entities do actually exist in the marketplace, that existence may negatively impact the commercial strength of its OUT FRONT Mark, that impact should be no more than of a moderate impact and lessoning of the strength of its OUT FRONT Mark.

37.     In the end, then, Q Publishing's OUT FRONT Mark has a reasonable overall strength and the Mark is entitled to reasonable judicial protection.  Accordingly, this factor tips in favor of a finding of infringement.

### B.     Relatedness of the Parties' Respective Goods and Services

38.     The parties produce and publish content which they distribute to the public in hopes of generating advertising revenue.  The parties' goods and services are thus, if not identical, highly related and this factor too tips in favor of a finding of infringement.

### C.     Similarity of the Marks

39.     Both parties use OUT in combination with FRONT as their primary business/brand name.  indeed, the only difference between the marks is that Q Publishing has a small space inserted between OUT and FRONT, while OMI does not use that space.  As one can see from the recent front cover of Q Publishing's paper, however, the space has become almost indiscernible, meaning the commercial impression of each party's OUTFRONT is virtually identical and this fact too strongly tips in favor of a finding of infringement.

### D.     Evidence of Actual Confusion

40.     While not necessary to a finding of likelihood of confusion, actual consumer confusion is strong evidence of infringement.  Here, there are numerous instances of consumers

being confused into wrongfully believing that Q Publishing has gotten into the billboard business.   A chart reporting on these instances of confusion is attached as Exhibit 4 and its contents are incorporated herein by this reference.   While this evidence establishes clear consumer confusion, three additional relevant events of confusion truly drive the point home.

41.     OMI is apparently represented by Dennis Wilson of Kilpatrick Townsend's San Francisco office ("Kilpatrick").   By letter dated January 14, 2015, Kilpatrick sent to Q Publishing's 3535 Walnut Street, Denver, Colorado 80205 address, an original invoice for legal services, Invoice No. 11588425, in the total amount of $11,103.  (*See* Exhibit 5.)  Q Publishing has since returned the original communication to Kilpatrick.   Nevertheless, however, if OMI's attorneys are confused by who is who, what hope does Q Publishing have that its advertisers and readers are not confused?

42.     Perhaps more troubling, advertisers are sending payments to Q Publishing for services performed by OMI and vice-versa.   These payments are both from entities which are and which are not joint advertisers of both parties.   For instance, OMI apparently has Cavalia (USA) Inc. of Shelburne, Vermont ("Cavalia"), as an advertiser.   Q Publishing has never heard of Cavalia, but nevertheless recently received a check made payable to OUTFRONT, 3535 Walnut Street, Denver, Colorado 80205, for $9,000 from Cavalia.  (*See* Exhibit 6.)  Q Publishing has now routed these funds to OMI, but the fact that an OMI advertising customer was so confused it sent $9,000 to a company with which it has never done business, shows the truly confusion nature of OMI's use of OUTFRONT.

43.     Another example of confusion is being exhibited by a joint advertiser of OMI and Q Publishing.  This advertiser is the Shane Co., who has sent Q Publishing two separate checks,

one for $22,117.82 and a second for $5,550.00 for billboard services.  (*See* Exhibit 7.)  The funds have now been routed to OMI, but again, these misdirected communications, sent to OUT FRONT, caused by OMI's unauthorized use of OUTFRONT, is obviously quite confusing to what one typically thinks of as a sophisticated business person.

44.     A third example of confusion concerns a current advertiser of Q Publishing who sent its payment for advertising services in OUT FRONT to OMI.  Specifically, the Colorado Symphony Orchestra ("CSO") has advertised with Q Publishing in the past.  More recently, Q Publishing charged the CSO $600 for an advertisement and became concerned when payment for that advertisement was not timely received.  Upon inquiry, Q Publishing learned that the $600 payment was mistakenly sent by CSO to OMI.  Q Publishing is now sure other payments meant for it have been sent to OMI.  OMI has not returned those funds or even advised Q Publishing that it is receiving funds meant for Q Publishing.

45.     Actual confusion evidence also strongly tips in favor of a finding of infringement.

### E.     Respective Marketing Channels

46.     The parties sell media advertising to relevant merchants locally, regionally and nationally.  Upon information and belief, many of these merchants overlap, meaning the parties' respective marketing channels are identical and/or highly related, and this factor also tips in favor of a finding of infringement.

### F.     Care of Purchasers

47.     One would expect that purchasers of advertising services would generally be sophisticated and exhibit reasonable care in their purchasing decisions.  However, the evidence explained above shows that even these sophisticated consumers are being confused into

believing that there is an association or other connection between Q Publishing and OMI.  This factor also thus tips in favor of a finding of infringement.

### G.        Junior Adopters Intent in Selecting the Mark

48.     Q Publishing does not know what investigation OMI may have conducted prior to adopting OUTFRONT as its new brand and business name.  However, prior to announcing its formal name change, Q Publishing advised CBS of its prior rights in and to OUT FRONT and demanded that CBS not adopt OUTFRONT as its new identity.  (*See* Exhibit 8.)  After CBS had already publicly announced adopting OUTFRONT as its new identity, Mr. Wilson of Kilpatrick responded to the demand letter, suggesting CBS/OMI would not voluntarily accede to Q Publishing's demands.  (*Id.*)  Q Publishing replied, reiterating its demand  (*Id.*), but  CBS/OMI did not respond further.

49.     OMI was well aware of Q Publishing and its prior rights prior to adopting OUT FRONT as the name of its business and services, but adopted a virtually identical mark for virtually identical services to be sold to virtually identical customers regardless of this knowledge.  While OMI may have some misguided rationale to believe that it had a right to proceed as it did, the law requires that junior users give wide berth to a senior user's rights, and in fact, exercise due care when adopting a new mark.  As outlined above, OMI did not exercise due care in adopting OUTFRONT.   Q Publishing thus can only conclude that OMI adopted OUTFRONT either with an actual intent to trample upon the preexisting trademark rights of Q Publishing, or with an indifference to Q Publishing and its rights.  Either way, this factor seems to again strongly point in favor of a finding of infringement.

### H.   Likelihood of Expansion of the Product Lines

50.    Q Publishing owns a media business and it does have expansion plans.  This should not be surprising to OMI, as it itself was borne from a business that experienced significant expansion over the last decade.   Q Publishing's expansion plans include both geographic and potentially product line expansion.  These facts further evidence a likelihood of consumer confusion and thus infringement.

### I.   Harm Resulting From OMI's Infringement

51.    As outlined above, Q Publishing caters to the LGBT community.  OMI, on the other hand, caters to more than 19,000 different advertisers in almost every field of endeavor. Some of those 19,000+ advertisers are known to be hostile to LGBT issues.  Some of those "hostile" advertisers are shown on the below CBS billboards, which Q Publishing understands will, over the coming months and years, be migrated to OUTFRONT billboards unless action is taken:



 

 

 

 

 

















52.     Any association of Q Publishing's OUTFRONT advertising business with OMI's intolerant advertisers will first cause Q Publishing significant reputational and then significant pecuniary harm.  Unfortunately, it will be difficult, if not impossible, for Q Publishing to identify all instances of that harm, as at least some customers who see the OMI advertisements of intolerant advertisers in association with the name OUTFRONT will just believe Q Publishing "sold out," discontinuing their association with Q Publishing.  Q Publishing may never know why it lost a particular account, but wrongly being seen as a "sell out" will undoubtedly lead to such losses.

53.     Also, Q Publishing is concerned that its advertisers are sending payments meant to Q Publishing to OMI.  One example of this harm is outlined above with the CSO situation.  A possible second example concerns a common advertiser between OMI and Q Publishing, Dr.

Grossman, who has an open invoice with Q Publishing and, when Q Publishing called to inquire about payment on that invoice, was informed that payment had been made.  Unfortunately, that payment was not received by Q Publishing and, much as with the CSO examples above, Q Publishing believes that Dr. Grossman's payment has been sent to OMI by mistake.  As a small business, Q Publishing cannot afford to lose payments or even wait months for payment routing to be corrected.   These types of losses are potentially a business-ending problem for Q Publishing.

## COUNT I
**(Unfair Competition Under § 43(a) of the Lanham Act)**

54.     Q Publishing hereby incorporates paragraphs 1-53 of this Complaint as though fully set forth herein.

55.     OMI's unauthorized use of OUTFRONT creates a likelihood of consumer confusion as to an affiliation, connection, or association between Q Publishing and/or as to the origin, sponsorship or approval of Q Publishing's services by OMI.

56.     OMI's unauthorized use of OUTFRONT has caused actual consumer confusion.

57.     OMI's unauthorized use of OUTFRONT in connection with advertising services and branded products, despite knowing Q Publishing's rights in and to the OUT FRONT Mark, is a willful violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

58.     As a result of OMI's unlawful actions, Q Publishing has suffered commercial harm.

59.     Q Publishing has been and continues to be harmed irreparably by OMI's actions and has no adequate remedy at law.

## COUNT II
### (Deceptive Trade Practices Under COLO. REV. STAT. § 6-1-105 (2013))

60.     Q Publishing hereby incorporates paragraphs 1-59 of this Complaint as though fully set forth herein.

61.     By the actions described above, OMI has engaged in deceptive trade practices, as defined by the Colo. Rev. Stat §§ 6-1-101 et seq.

62.     Upon information and belief, OMI's wrongful actions were committed with an intent to deceive the public and with willful and wanton disregard of the laws of the State of Colorado and Q Publishing's superior rights.

63.     As a result of OMI's unlawful actions, Q Publishing has suffered commercial harm.

64.     Q Publishing has been and will continue to be irreparably harmed by OMI's unlawful actions, and Q Publishing has no adequate remedy at law.

## COUNT III
### (Unfair Competition Under Colorado Common Law)

65.     Q Publishing hereby incorporates paragraphs 1-64 of this Complaint as though fully set forth herein.

66.     OMI's actions as described above have caused and are likely to cause confusion with the established and superior rights of Q Publishing and otherwise unfairly compete with Q Publishing.  As such, OMI's actions constitute unfair competition under Colorado common law.

67.     As a result of OMI's wrongful actions, Q Publishing has suffered commercial harm.

68.     OMI's wrongful actions were committed with willful and wanton disregard for Q Publishing's rights.

69.     Q Publishing has been and continues to be harmed irreparably by OMI's actions, and Q Publishing has no adequate remedy at law.

## COUNT IV
### (Misappropriation Under Colorado Common Law)

70.     Q Publishing hereby incorporates paragraphs 1-69 of this Complaint as though fully set forth herein.

71.     OMI's actions as described above have caused and are likely to cause confusion with the established and superior rights of Q Publishing and otherwise unfairly compete with Q Publishing.  As such, OMI's actions constitute misappropriation under Colorado common law.

72.     As a result of OMI's wrongful actions, Q Publishing has suffered commercial harm.

73.     OMI's wrongful actions were committed with willful and wanton disregard for Q Publishing's rights.

74.     Q Publishing has been and continues to be harmed irreparably by OMI's actions, and Q Publishing has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Q Publishing prays for judgment in its favor and against OMI as follows:

A.     That OMI, its agents, servants, employees, attorneys, privies, representatives, successors, assigns and other related entities, and any and all persons in act of concert or participation with it, be preliminarily and permanently enjoined from:

(1)     any further infringement of the OUT FRONT Mark;

(2)     any further direct or indirect use of the OUTFRONT Mark or any mark which is confusingly similar thereto;

(3)     performing any action or using any other mark which is likely to cause confusion or mistake, or to deceive or otherwise mislead the trade and/or the public into believing that Q Publishing and OMI are one and the same or in some way connected, or that OMI is the sponsor of Q Publishing, or that Q Publishing is in some manner affiliated or associated with, or under the supervision or control of OMI, or that Q Publishing's services originate with OMI, or are connected or offered with the approval, consent, authorization, or under the supervision of OMI;

(4)     marketing or selling any product or material, or offering any services, containing or utilizing Q Publishing's intellectual property; or

(5)     any other conduct constituting unfair competition with Q Publishing.

B.     That OMI be ordered to withdraw its OUTFRONT U.S. trademark applications;

C.     That OMI be ordered to pay for an advertisement campaign, to be developed by Q Publishing, to correct the misperception by consumers that Q Publishing and its publications are in any way affiliated with OMI;

D.     That Q Publishing be awarded damages in a reasonable amount to be proved at trial for all infringing activities, including costs incurred by Q Publishing in preventing future confusion, mistake or deception, all from the date of first infringement;

E.     That Q Publishing be awarded treble actual damages and attorneys' fees under relevant law;

F.     That Q Publishing be awarded punitive damages;

G.      That Q Publishing be awarded pre-judgment and post-judgment interest;

H.      That Q Publishing be awarded costs and expenses, including expert witness fees; and

I.      That such other and further preliminary and permanent relief be awarded as the Court deems appropriate.

## **JURY DEMAND**

Q Publishing hereby demands a jury trial on issues so triable.

Respectfully submitted,


Dated: February 13, 2015                By:  ___s/ Robert R. Brunelli_____
                                             Robert R. Brunelli
                                                 rbrunelli@sheridanross.com
                                             SHERIDAN ROSS P.C.
                                             1560 Broadway, Suite 1200
                                             Denver, Colorado 80202
                                             Telephone:     303-863-9700
                                             Facsimile:     303-863-0223
                                             Email:  litigation@sheridanross.com

                                             ATTORNEYS FOR PLAINTIFF